**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **FABRICLEAR, LLC,** | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | **NO. 20-10580-TSH** |
| v. | ) | |
| | ) | |
| **HARVEST DIRECT, LLC,** | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER ON HARVEST DIRECT'S MOTION TO DISMISS
(Docket No. 13)**

**August 24, 2020**

**HILLMAN, D.J.,**

FabriClear, LLC ("FabriClear") filed this action against Harvest Direct, LLC ("Harvest Direct"), alleging breach of contract, trade secret misappropriation, unjust enrichment, breach of the implied covenant of good faith and fair dealing, false designation of origin, and unfair competition. (Docket No. 1). Harvest Direct moves to dismiss all claims. (Docket No. 13). For the following reasons, the Court ***denies*** its motion.

**Background[1]**

In the early 2000s, after seeing reports of a growing bedbug epidemic in New York City, Mark Panagiotes, the owner of FabriClear, developed a spray to treat bedbug infestations. He called his product FabriClear (the "FabriClear Product") and filed for trademark protection for use of the mark FABRICLEAR in connection with "insecticide for dust mites and bedbugs and moths."

---

[1] The following facts are taken from the FabriClear's complaint (Docket No. 1) and assumed true for the purposes of this motion.

He also prepared labels and packaging featuring the FabriClear mark and incorporating red and green design elements on a bright yellow background.[2]

In 2013, FabriClear approached Harvest Direct, a company that engages in "As Seen on TV" marketing and sales, to discuss bringing the FabriClear Product to market. The companies executed a Confidentiality Agreement specifying, *inter alia*, that the FabriClear Product formula was a trade secret and that Harvest Direct could not reproduce, use, alter, or modify it without FabriClear's written permission. The agreement also provided for any "inventions, discoveries, improvements, alterations and/or modifications" which resulted from the Confidentiality Agreement to be the sole and exclusive property of FabriClear. (Docket No. 1 at 3).

With these protections in place, FabriClear disclosed "information on the formulation, sourcing, pricing and marketing of the FabriClear® Product" to Harvest Direct. (Docket No. 1 at 3). The parties then negotiated for Harvest Direct to market and sell the FabriClear Product. FabriClear prepared a written License Agreement summarizing the terms of their contract.[3] Among other things, the agreement gave Harvest Direct an exclusive license to market and sell the FabriClear Product and to use FabriClear's "trademarks, trade names, copyrights, trade secrets, technical data, information, know-how, formulas, and other intellectual property rights" while doing so.[4] (Docket No. 1 at 4). In exchange for this license, Harvest Direct committed to paying FabriClear royalties, calculated as set percentage of sales during each calendar month.

---

[2]   Although Harvest Direct later modified this packaging in minor respects, "[t]he packaging ultimately used was substantially similar to the original packaging and logo." (Docket No. 1 at 5).

[3]   The License Agreement was not formally executed, but the parties orally agreed to the terms and operated in accordance with the agreement for several years.

[4]   The License Agreement only authorized Harvest Direct to use FabriClear's confidential information for the purposes expressly contemplated by the agreement, i.e., to market and sell the FabriClear Product, and FabriClear retained ultimate ownership of the intellectual property rights.

Over the next few years, sales of the FabriClear Product were robust. Towards the end of 2018, however, sales declined.[5] When FabriClear inquired into the reason for the decline, a Harvest Direct employee privately mentioned that Harvest Direct had begun marketing and selling its own competing bedbug product (the "X-Out Product"). FabriClear subsequently learned that Harvest Direct had been working on developing this product since at least as early as 2015 and that its goal was to avoid making the necessary royalty payments to FabriClear.

The X-Out Product is indistinguishable from the FabriClear Product in all relevant respects. The label for the X-Out Product lists the same ingredients as the label for the FabriClear Product, and the packaging for the two products is similar:



There is evidence, moreover, Harvest Direct initially did not source its own product but instead repackaged existing bottles of FabriClear Product under the X-Out label. For example, an FBI investigation revealed that at least one bottle of X-Out Product contained a FabriClear label under the X-Out label:

---

[5] Harvest Direct made its last royalty payment to FabriClear in November 2018 and has not reported any sales of the FabriClear Product since that date.



And FabriClear alleges that it is aware of several other instances in which Harvest Direct sold FabriClear Product with X-Out labeling applied over the FabriClear labeling.

On April 12, 2019, FabriClear sent a letter to Harvest Direct demanding compliance with the terms of the parties' agreements and the immediate cessation of Harvest Direct's relabeling activities. After receiving the demand letter, Harvest Direct stated that it wished to continue working with FabriClear. FabriClear, believing that this response signaled agreement to comply with the terms of the parties' contracts, continued to supply Harvest Direct with FabriClear Product. Harvest Direct, however, did not (and to date, has not) stopped marketing or selling its X-Out Product, and while the Harvest Direct website still purports to offer the FabriClear Product, it lists the FabriClear Product as "out of stock."

FabriClear filed suit in this Court on March 24, 2020. (Docket No. 1). The complaint raises the following claims: breach of the License Agreement (Count I); breach of the Confidentiality Agreement (Count II); misappropriation of trade secrets (Count III), unjust enrichment (Count IV[6]); breach of the implied covenant of good faith and fair dealing (Count V); unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C.

---

[6] FabriClear labels this claim as Count III, but it has already identified the trade secret misappropriation claim as Count III. The Court thus treats this claim as Count IV and appropriately modifies the numbering of the remaining claims.

§ 1125(a) (Count VI); and unfair competition in violation of M.G.L. c. 93A, § 11 (Count VII). Harvest Direct moved to dismiss all claims on May 7, 2020.  (Docket No. 13).

## Standard of Review

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).  To survive the motion, the complaint must allege "a plausible entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

## Discussion

### 1. Count I (Breach of License Agreement)

Count I asserts a claim for breach of contract with respect to the License Agreement.  To establish a prima facie case of breach of contract, a plaintiff must show "(1) the existence of a valid and binding contract; (2) that plaintiff has complied with the contract and performed his own obligations under it; and (3) breach of the contract causing damages."  *Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 34 (1st Cir. 2003).

FabriClear has met its pleading burden here. It alleges that the parties entered into a contract memorialized by the License Agreement; that the terms of this contract required Harvest Direct to pay royalties on all sales of the FabriClear Product and to only use FabriClear's confidential information for limited purposes; and that Harvest Direct breached these terms by failing to pay the requisite royalties and misusing FabriClear's confidential information to develop, market, and sell a competing product. These allegations "describe the alleged terms of the contract in a sufficiently specific manner to give the defendant notice of the nature of the claim." *See Moore v. La–Z–Boy, Inc.*, No. 07-10708, 2007 WL 1858624, at *1 (D. Mass. June 27, 2007).

Harvest Direct contends that the Court should nonetheless dismiss this claim because License Agreement is not enforceable as a matter of law. But its argument relies on entitlement to an affirmative defense, namely, the License Agreement's purported failure to comport with the Statute of Frauds. And while Harvest Direct is correct that a court may dismiss a claim on affirmative defense ground if "the facts establishing the defense must be clear 'on the face of the plaintiff's pleadings,'" *see Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001) (quoting *Aldahonda–Rivera v. Parke Davis & Co.*, 882 F.2d 590, 591 (1st Cir. 1989)); *see also, e.g.*, *Primarque Prod. Co. v. Williams W. & Witt's Prod. Co.*, No. 15-30067, 2015 WL 10097150, at *3 (D. Mass. Nov. 18, 2015), FabriClear's complaint does *not* definitively establish a violation of the Statute of Frauds. It is not clear from the face of the complaint, for example, whether the License Agreement is subject to the Statute of Frauds. FabriClear suggests that the terms of this agreement could have been performed within one year, and if it is correct, the Statute of Frauds would not govern. Even if the contract does fall within the scope of the Statute of Frauds, however, certain allegations within the complaint are consistent with the application of an exception to the Statute of Frauds (e.g., estoppel or performance). The Court thus finds dismissal inappropriate at

this juncture. *See Blackstone Realty LLC*, 244 F.3d at 197 (noting that dismissal is only appropriate if "review of the complaint . . . 'leave[s] no doubt' that the plaintiff's action is barred by the asserted defense" (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)). It accordingly ***denies*** the motion as to Count I.

### 2. Count II (Breach of Confidentiality Agreement)

Count II asserts a breach of contract claim relative to the Confidentiality Agreement. In support, FabriClear alleges that the parties entered into a contract when they executed the Confidentiality Agreement; that this contract required Harvest Data to protect FabriClear's confidential information and only use that information for purposes contemplated by the Confidentiality Agreement; and that Harvest Direct breached these terms by misusing FabriClear's confidential information to develop a competing product. The Court finds these allegations sufficient to state a claim for breach of contract. *See Moore*, 2007 WL 1858624, at *1.

Harvest Direct argues that the Court should nonetheless grant its motion to dismiss because Confidentiality Agreement does not comport with the Statute of Frauds and thus does not constitute an enforceable contract as a matter of law. The complaint, however, does not definitively establish a violation of the Statutes of Fraud. *See Blackstone Realty LLC*, 244 F.3d at 197. Indeed, by stating that the parties "executed" the Confidentiality Agreement, the complaint suggests that the parties *did* comply with the Statute of Frauds. The Court thus ***denies*** the motion to dismiss Count II.

### 3. Count III (Misappropriation of Trade Secrets)

Count III asserts that Harvest Direct misappropriated FabriClear's trade secrets in violation of common law and M.G.L c. 93, § 42. To establish a claim for misappropriation of trade secrets, a plaintiff must show that (1) the information at issue qualifies as a trade secret, (2) it "took

reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

Harvest Direct contends that the complaint fails to state a claim because FabriClear has not shown that the information it disclosed qualifies as a trade secret.[7] The Court rejects this argument. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *T.H. Glennon Co., Inc. v. Monday*, No. 18-30120, 2020 WL 1270970, at *14 (D. Mass. Mar. 17, 2020) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)). Here, FabriClear pleads that it disclosed confidential and proprietary information regarding the formula, source, and marketing and pricing of the FabriClear Product. It further pleads that this information "derives significant economic value from not being generally known to, or readily ascertainable through legitimate means by the general public" and that it took steps to preserve the secrecy of this information "by having Harvest Direct agree to the Confidentiality Agreement before disclosing the formulation to Harvest Direct and by entering into the Licensing Agreement with Harvest Direct under which Harvest Direct could not use the confidential, proprietary, and trade secret information outside of the scope of the License Agreement."[8] (Docket No. 1 at 12). The Court finds these allegations sufficient, for the present purposes, to establish that the information received by Harvest Direct was a trade secret.

---

[7] Harvest Direct does not appear to dispute that, if the information disclosed by FabriClear qualifies as a trade secret, the complaint sufficiently alleges misappropriation.

[8] For the reasons discussed above, the Court declines to find the Confidentiality Agreement or License Agreement unenforceable as a matter of law. The Court thus cannot assume, as Harvest Direct wishes the Court to do, that FabriClear disclosed its confidential and proprietary information without taking adequate steps to preserve its secrecy.

Harvest Direct alternatively suggests that, even if some of the information may qualify as a trade secret, the formula itself cannot because it is a matter of public knowledge. *See Iconics, Inc. v. Massaro,* 266 F. Supp. 3d 449, 452 (D. Mass. 2017) ("[A]s the name suggests, a trade secret must be a secret; '[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.' (quoting *J.T. Healy & Son, Inc.*, 357 Mass. at 736)). Harvest Direct's argument, however, relies on FabriClear having published its formula when it filed for trademark protection before the Patent and Trademark Office, and the Court cannot say as a matter of law that FabriClear did any such thing. While FabriClear published the *ingredients* for the formula in its trademark application, it did not disclose the composition of those ingredients (apart from the four active ingredients, which account for roughly 1% of the formula). And nothing in the complaint suggests the public would know the composition of the remaining ingredients in the absence of such a disclosure. The Court thus declines to assume the formula was public knowledge at this stage in the proceeding. *Cf. Peggy Lawton Kitchens, Inc. v. Hogan*, 466 N.E.2d 138, 139-40 (Mass. App. Ct. 1984) (noting that a cookie recipe could qualify as a trade secret despite using "basic ingredients" such as "flour, sugar, shortening, chocolate chips, eggs, and salt" because "[t]he combination in which those ingredients are used, the diameter and thickness of the cookie, and the degree to which it is baked . . . constitute a formula which its proprietor could protect from infringement by an employee who either gains access to the formula in confidence or by improper means."). It accordingly ***denies*** the motion to dismiss Count III.

*4. Count IV (Unjust Enrichment)*

Count IV asserts a claim of unjust enrichment. Harvest Direct argues that the Court should dismiss this claim because FabriClear has not shown the existence of an enforceable contract. A

remedy for unjust enrichment, however, does not depend on the existence of an enforceable contract.[9] The Court accordingly ***denies*** the motion to dismiss Count IV.

### 5. *Count V (Breach of Implied Covenant of Good Faith and Fair Dealing)*

Count V asserts a claim for breach of the implied covenant of good faith and fair dealing. "In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of (the plaintiff) to receive the fruits of the contract." *Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012) (quoting *Boyle v. Douglas Dynamics, LLC*, 292 F. Supp. 2d 198, 209–10 (D. Mass. 2003)); *see also Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004) (noting that the covenant does not exist outside a contractual relationship and "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance").

Harvest Direct suggests that the Court should dismiss because FabriClear does not establish the existence of an enforceable contract. *See Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*., 412 F.3d 215, 230 (1st Cir. 2005) (noting that "without a contract, there is no covenant to be breached"). The Court rejects this argument for the reasons discussed above. Harvest Direct also appears to argue that FabriClear has not shown it took any action "that had the

---

[9] Indeed, the unjust enrichment claim is only viable to the extent FabriClear *cannot* establish the existence of an enforceable contract in Count I or Count II. *See Zelby Holdings, Inc. v. Videogenix, Inc.*, 92 Mass. App. Ct. 86, 92 (2017) ("It is well settled that a claim of unjust enrichment 'will not lie where there is a valid [underlying] contract that defines the obligations of the parties.'" (quoting *Metropolitan Life Ins. Co. v. Cotter*, 464 Mass. 623, 641 (2013))); *see also Karter*, 248 F. Supp. 3d at 311. FabriClear may assert both claims in its complaint, but ultimately, they provide mutually exclusive avenues of relief.

effect of destroying or injuring" FabriClear's rights "to receive the fruits of the contract." *See Blake*, 898 F. Supp. 2d at 388–89. After parsing the complaint, however, the Court disagrees. FabriClear alleges that it had a right under the License Agreement and Confidentiality Agreement to receive a royalty on all sales of the FabriClear Product and to prevent Harvest Direct from using its intellectual property for purposes outside the scope of the parties' contracts. It further pleads that Harvest Direct prevented it from enjoying these rights by (1) acting in bad faith to develop, sell, and market a competing product for which it would not need to make the necessary royalty payments, and (2) misusing FabriClear's intellectual property in the process. These allegations, taken as true, suffice to establish plausible entitlement to relief for breach of the implied covenant of good faith and fair dealing. Accordingly, the Court ***denies*** the motion to dismiss Count V.

### 6. *Count VI (Unfair Competition and False Designation of Origin)*

Count VI asserts a claim of unfair competition and false designation of origin based on Harvest Direct's sale and marketing of the X-Out Product. In support, FabriClear alleges that Harvest Direct "offered for sale and has sold" FabriClear Product under the X-Out trademark. (Docket No. 1 at 15). Specifically, it pleads that Harvest Direct repackaged existing bottles of FabriClear Product under the X-Out label and sold them as X-Out Product. The Court finds this allegation sufficient to state a claim for false designation of origin. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003) (noting that a claim of false designation of origin premised on one company buying another company's product and repackaging the product as its own "would undoubtedly be sustained").

Harvest Direct contends that the Court should nonetheless grant its motion to dismiss because FabriClear has not alleged the existence of any consumer confusion. The Court is not convinced that FabriClear needed to plead consumer confusion given the nature of its claim—as

Chief Judge Saylor noted in *The Hilsinger Co. v. Kleen Concepts, LLC*, 164 F. Supp. 3d 195 (D. Mass. 2016), where a plaintiff alleges literal falsity, as FabriClear has done here, a violation of the Lanham Act "'may be established without evidence of consumer deception,'" *id.* at 200 (quoting *Cashmere & Camel Hair*, 284 F.3d at 311)—but even assuming it did, the Court determines that FabriClear has met its pleading burden. The Court reasonably infers from the well-pled factual allegations in the complaint that consumers were deceived as to the origin of X-Out Product every time they purchased a bottle of purported X-Out Product that was, in fact, repackaged FabriClear Product. The accordingly Court ***denies*** the motion to dismiss Count VI.

### *7. Count VII (Unfair Competition)*

Count VII asserts a claim under M.G.L. c. 93A, § 11. FabriClear alleges that, by continuing to misuse its confidential, proprietary, and trade secret information and by "palming off FabriClear® Product as Harvest Direct's X-Out product," Harvest Direct has committed unfair and deceptive trade practices. (Docket No. 1 at 16). Harvest Direct premises its dismissal argument on the non-existence of trade secret information or any false designation of origin. But the Court has already rejected these arguments. The Court thus ***denies*** the motion to dismiss Count VII.

### **Conclusion**

For the reasons stated above, Harvest Direct's motion to dismiss is ***denied***. (Docket No. 13).

**SO ORDERED**

                                                                                 */s/ Timothy S. Hillman*
                                                                               **TIMOTHY S. HILLMAN**
                                                                                   **DISTRICT JUDGE**